# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **JAMES RIVER INSURANCE COMPANY,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:24-cv-00373-TES** |
| **A.L. MILLER VILLAGE, LP,** *et al.,* | |
| *Defendants.* | |

## ORDER

This insurance-coverage dispute arises out of Plaintiff James River Insurance Company's decision to deny coverage in the underlying lawsuit brought after the death of Eric Payton Thomas.[1] [Doc. 14-1, ¶ 16]. Thomas's death resulted from a shooting that occurred on the property owned by Defendant A.L. Miller Village, LP and managed by Defendant Fairway Management, Inc. [*Id.*]. Following the shooting, Thomas's minor child, through his mother—Dayelis Rodriguez—filed suit against A.L. Miller and Fairway (collectively, the "Insureds"). [*Id.* at ¶¶ 17, 18].

Before getting too deep in the facts of the underlying suit, the Court needs to explain how these parties first became involved with each other. James River issued a

[1] The Court primarily cites to the Insureds' Response to Plaintiff's Statement of Undisputed Material Facts, as that filing outlines the facts as both parties see them—*i.e.,* it includes Plaintiff's factual propositions along with the Insureds' responses. *See* [Doc. 14-1].

Commercial Excess Liability Policy (the "Excess Policy") to named insured National

Real Estate Purchasing Group, for the period of May 15, 2023, until May 15, 2024. [*Id.* at

¶ 1]. The Excess Policy[2] covers the property at issue in this case via endorsements and

certificates issued by National Real Estate Purchasing Group to A.L. Miller's parent

company—JES Holdings. [*Id.* at ¶¶ 2–4, 15].

The terms of the Excess Policy require prompt written notification following any

claim or suit "which is reasonably likely to involve this policy[.]" [*Id.* at ¶ 14]. Even

more, the Excess Policy explains that "You and any other 'insured' must immediately

send us copies of any demands, notices, summonses, or legal papers received in

connection with the claim or suit." [*Id.*].

Now, back to the underlying claim. On June 16, 2023, Thomas died from a

shooting on A.L. Miller's property. [*Id.* at ¶ 16]. On January 10, 2024, counsel for

Thomas's family sent a letter to A.L. Miller regarding the shooting and advised A.L.

Miller to "immediately notify its insurers and excess insurers of the existence of the

family's/estate's premises liability claims." [*Id.* at ¶ 22]. Five weeks later, Thomas's

family filed suit against A.L. Miller and Fairway in the State Court of Bibb County,

Georgia. [*Id.* at ¶ 24].

Notably, and despite the letter and court action, between June 16, 2023, and May

---

[2] The underlying primary insurance provides "Commercial General Liability coverage with a $2 million each Occurrence limit and a $4 million general aggregate limit, pursuant to American Standard Insurance Company of Ohio Policy No. 91002-88955-93[.]" [Doc. 14-1, ¶ 9].

15, 2024, "neither A.L. Miller nor Fairway provided notice of the occurrence to James River." [*Id.* at ¶ 19]. Specifically, the Insureds' counsel waited until May 15, 2024, to notify James River by forwarding a notice that included the Thomas family's offer of judgment seeking $12 million. [*Id.* at ¶ 28]. After receiving notice, James River asked counsel for the Insureds for "any information . . . regarding notice being provided to James River at any time prior to May 15, 2024." [*Id.* at ¶ 30]. James River denied coverage on July 25, 2024. [*Id.* at ¶ 32]. In denying coverage, James River advised that

> A.L. Miller and Fairway had failed to provide notice to James River as soon as practicable of the occurrence – that is, the June 16, 2023 shooting; failed to notify James River in writing or otherwise once a claim was made in January 2024 and suit was filed in February 2024, and failed to immediately send James River copies of any summonses and legal papers received in connection with the claim or suit.

[*Id.* at ¶ 33]. Following James River's denial of coverage, the Insureds filed suit against James River in a state court in Virginia seeking declaratory judgment and other claims. [*Id.* at ¶ 35].

James River filed the instant Motion for Summary Judgment [Doc. 5] on November 21, 2024. Following that Motion, the Insureds filed a Motion to Dismiss [Doc. 13] citing the ongoing declaratory-judgment action in Virginia state court. The Court addresses each in turn.

## MOTION TO DISMISS

### I.    Legal Standard

"Since its inception, the Declaratory Judgment Act has been understood to confer

on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). Indeed, the Supreme Court clearly discourages federal courts from "proceed[ing] in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942). To assist district courts in making these decisions, the Eleventh Circuit promulgated nine factors to consider:

(1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts;

(2) whether the judgment in the federal declaratory action would settle the controversy;

(3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue;

(4) whether the declaratory remedy is being used merely for the purpose of "procedural fencing"—that is, to provide an arena for a race for *res judicata* or to achieve a federal hearing in a case otherwise not removable;

(5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction;

(6) whether there is an alternative remedy that is better or more effective;

(7) whether the underlying factual issues are important to an informed resolution of the case;

(8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

(9) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or

statutory law dictates a resolution of the declaratory judgment action.

*Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1331 (11th Cir. 2005). This "list is

neither absolute nor is any one factor controlling[.]" *Id.*

II.   **Discussion**

The Insureds insist that this Court should abstain from hearing the case to allow

the Virginia state court to decide the issues regarding coverage and any breach-of-

contract claims. [Doc. 20, p. 1]. According to the Insureds, Virginia's interests are

stronger because the underlying claims involve a Virginia-based insurance company

that declined coverage. [*Id.*]. The Insureds contend that "[p]roceeding in this venue

serves no purpose other than to fracture the litigation, inflate costs, and waste judicial

resources." [*Id.* at p. 2].

By contrast, James River argues that the relevant considerations of federalism

and comity "have much less weight when the relevant state court proceeding is filed in

a state that has almost no connection to the dispute and whose law does not govern the

dispute." [Doc. 18, p. 7].

The Court reviews the relevant factors in turn.

   a.   *Factors 1, 5 & 9 — "State Interest" Factors*

The Court begins, as the parties do, by grouping together factors 1, 5, and 9 — the

"state interest" factors. The Insureds argue that Virginia maintains an interest in this

litigation because "Virginia courts have a significant interest in adjudicating disputes

involving insurers domiciled in the state[.]" [Doc. 13, p. 8]. Continuing, the Insureds argue that "[t]he Virginia court is already addressing the parties' coverage dispute, which arises entirely under state law." [*Id.*].

In response, James River contends that the proper inquiry regarding a state's interest involves looking to "where the insured and claimant are located, where the underlying tort occurred, and whether the state's law applies to the dispute[.]" [Doc. 18, p. 8]. As James River lays out, "This dispute involves an insurance policy issued outside of Virginia, a Georgia insured and a Missouri insured doing business in Georgia, a shooting that occurred in Georgia, a Georgia decedent, a Georgia claimant, and an underlying suit filed and being litigated in Georgia state court. The only connection between this dispute and Virginia is that James River is headquartered in Virginia." [*Id.*]. But, regardless of the corporate domiciles involved in the issuance of the policy, the underlying wrongful death case that spawned this declaratory judgment action clearly has more to do with Georgia than Virginia.[3]

---

[3] To be sure, even the Insureds argue that most events occurred outside of Virginia. *See* [Doc. 20, p. 1 ("James River is a Virginia insurer, organized under *Ohio* law, with no real ties to Georgia. It issued a *Texas* policy to a *Texas* entity (the National Real Estate Purchasing Group), which then issued a coverage certificate to a *Missouri* company (JES Holdings, ALM's parent). That coverage extended to more than 200 properties in 11 states—one of which happens to be the *Georgia* apartment complex where the shooting occurred. Even Fairway, the property management company tasked with managing the complex, is a *Missouri* entity." (cleaned up))].

And, even more, the Insureds contend "The only real connections to Georgia are that the underlying shooting happened here, and that ALM is a Georgia entity. That's it." [Doc. 20, p. 1]. "That's it" is doing a lot of work in that sentence. Indeed, those "connections" are what gives rise to this dispute no matter where the court case is filed.

As to controlling substantive law, the parties correctly point out that the forum dictates the applicable law. But, under no scenario[4] does Virginia law apply. Indeed, if this Court maintains jurisdiction, then Georgia law applies. If Virginia decides the case, it will most likely apply a mixture of Missouri[5] and possibly Georgia law.[6]

Regardless, it's unclear the exact interest that Virginia has in applying foreign law in its courts.[7] *Milford Cas. Ins. Co. v. Meeks*, 856 F. App'x 270, 274 (11th Cir. 2021). Sure, Virginia may have some interest in how insurance companies domiciled within its borders are regulated. But, it is not clear how strongly a Virginia court protects that interest in a case where it is bound to follow the law of another state. Accordingly, the Court finds that Virginia's interests in this matter are not so significant to warrant this Court's abstention.

---

[4] At least not a scenario that either party presented to the Court. To be sure, the Insureds do not contend that the Virginia court would apply Virginia law; they concede that Missouri law applies due to Virginia's application of "*lex loci contractus*." [Doc. 20, p. 5]. Instead, they lament Georgia's "preservation of its antiquated 'presumption of identity' rule." [*Id.* at p. 4]. That argument comes perilously close to admitting the Insureds' motives to file in a forum outside of Georgia—or, in other words, participating in forum shopping. *See also* [Doc. 20, p. 2 (describing Georgia's choice-of-laws as "idiosyncratic")].

[5] *Supra* n.4.

[6] Virginia also applies foreign law to breach-of-contract claims when the performance occurred in that state. [Doc. 18, p. 9 n.3]; *see also Seneca Specialty Ins. Co. v. Dockside Dolls, Inc.*, No. 3:12CV19-REP-DJN, 2012 WL 3579879, at *3 (E.D. Va. June 22, 2012).

[7] And, regardless of choice-of-law analyses, the Insureds brought a Missouri statutory claim in their Virginia action. There is no clear interest of a Virginia court in applying a Missouri statutory claim.

      b.    *Factors 2, 3 & 6—Finality, Clarification of Legal Issues, and Alternative Remedies*

The Insureds argue that this action will not completely settle the controversy because the Virginia action includes breach-of-contract claims. [Doc. 13, p. 9]. However, as James River points out, if the Court grants its summary-judgment motion, then the Insureds' breach and bad-faith claims fail as a matter of law. That's because "if there is no coverage for a claim, there can be no recovery for bad faith refusal to pay the claim." *Whiteside v. GEICO Indem. Co.*, 352 F. Supp. 3d 1257, 1266 (M.D. Ga. 2018). The same is true under Virginia and Missouri law, too. *Brenner v. Laws. Title Ins. Corp.*, 240 Va. 185, 193 (1990); *Progressive Preferred Ins. Co. v. Reece*, 498 S.W.3d 498, 506 (Mo. Ct. App. 2016); *Wood v. Safeco Ins. Co. of Am.*, 980 S.W.2d 43, 46 (Mo. Ct. App. 1998). Therefore, this action can provide finality and clarity of the distinct legal question regarding coverage under the Excess Policy.

For the sixth factor, the Insureds argue that "the Virginia Action encompasses all claims and issues related to the coverage dispute, including the Insureds' breach of contract and bad faith claims." [Doc. 13, p. 14]. Continuing, the Insureds insist that "[r]esolving the dispute in Virginia will ensure that all related matters are addressed in a single action, avoiding the inefficiency, duplication, and piecemeal litigation that could arise from competing parallel proceedings." [*Id.*]. But, as the Court explained, this action will also bring an end to the claims presented in both actions.

c.    *Factor 4—Procedural Fencing*

The fourth factor evaluates the possible motives of invoking the Court's jurisdiction. Put another way: Is a party attempting to open the doors to federal court which are otherwise closed to them? *Ameritas*, 411 F.3d at 1331.[8] To be sure, James River cannot remove the Virginia state-court action because James River is a resident of Virginia. *See* 28 U.S.C. § 1441(b)(2). Therefore, the Insureds ask the Court to assume that James River filed this action as a procedural work-around to get to a more favorable forum. But, as one district noted, "[i]t is unreasonable to penalize a party for exercising the rights given to it under the federal Declaratory Judgment Act." *Cypress Ins. Co. v. Jesse Batten Farms, LLC*, 662 F. Supp. 3d 1337, 1351 (M.D. Ga. 2023) (finding that a federal-court action filed four days after the parallel state-court action was not "procedural fencing"); *see also James River Ins. Co. v. Rich Bon Corp.*, 34 F.4th 1054, 1058 (11th Cir. 2022) ("Nor does anything in the Act prevent a state court defendant from bringing a federal declaratory judgment suit."). And, as the Court already noted, the Insureds made their thoughts regarding Georgia's "antiquated" laws well-known. Regardless, the Court finds the fourth factor weighs neither for nor against abstention.

---

[8] And, as the Eleventh Circuit explained, this factor "weighs more heavily in favor of declining jurisdiction as the similarity of concurrent proceedings increases." *Nat'l Tr. Ins. Co. v. S. Heating & Cooling Inc.*, 12 F.4th 1278, 1287 (11th Cir. 2021).

>    d.    *Factor 7 & 8—Factual Issues and Determinations*

For the seventh and eighth factors, the Insureds argue that the Virginia action is best suited to handle the factual issues regarding the Excess Policy's terms. The Insureds contend (again) that "[t]he Virginia court is better positioned to evaluate these factual issues because it is presiding over the broader dispute, which includes all claims asserted by the Insureds—coverage, breach of contract, and bad faith." [Doc. 13, p. 16]. However, this Court can resolve any necessary factual issues, just like the Virginia court. Therefore, these factors are neutral to the overarching abstention question.

## III.    <u>Conclusion</u>

After reviewing the totality of the circumstances, the Court finds that "there is [nothing] unique or extraordinary that differentiates [this] case from the mine run of liability insurance disputes." *James River*, 34 F.4th at 1063 (Brasher, J., concurring). Indeed, if the state action had been filed in Missouri—the state whose law would otherwise govern the case—this discussion might have turned out differently. But, Virginia's interest in applying the law of another state in its courts is dubious at best. *See James River*, 34 F.4th at 1058 (discussing the preservation of "the States' interests in resolving issues of state law in their *own* courts"). And, this Court can provide a swift, efficient end to the litigation because the parties have already briefed and submitted a summary-judgment motion that is ready for the Court's attention. Therefore, the Court exercises its substantial discretion, *see James River*, 34 F.4th at 1060, and **DENIES** the

Insureds' Motion to Dismiss [Doc. 13].

## MOTION FOR SUMMARY JUDGMENT

### I.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[9] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material

---

[9] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

II.    **Discussion**[10]

This case is before the Court pursuant to the Court's diversity jurisdiction;

therefore, the Court "look[s] to Georgia's choice-of-law requirements to determine

which state's law will apply." *Mt. Hawley Ins. Co. v. E. Perimeter Pointe Apartments*, 861 F.

App'x 270, 275 (11th Cir. 2021). Here, the choice-of-law analysis is simple: both parties

(and the Court) agree that, under these circumstances,[11] Georgia law applies. *See* [Doc.

5, p. 7]; [Doc. 14, p. 9]. Accordingly, the Court applies Georgia law.

---

[10] The Insureds insist discovery is necessary before the Court can adequately decide the instant Motion. The Court disagrees. Sure, "[a]s a general rule summary judgment should not be granted until the party opposing the motion has had an adequate opportunity to conduct discovery." *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 843 (11th Cir. 1989). But the Eleventh Circuit hasn't placed a "blanket prohibition on the granting of summary judgment motions before discovery[.]" *Id.* Instead, to prevent such a motion, the non-movant must demonstrate the specific need for discovery. *See Wallace v. Brownell Pontiac-GMC Co.*, 703 F.2d 525, 527 (11th Cir. 1983); Fed. R. Civ. P. 56(d). Here, the Insureds argue that "discovery is crucial to fully address the central issues raised in James River's Motion, including a determination of when the Insureds' former risk manager obtained knowledge of facts reasonably implicating the Excess Policy, and when James River received actual notice of the Thomas Claim, among other inquiries." [Doc. 14, p. 7].

However, James River filed evidence from its case manager for this claim—Annette Demmink—stating James River "did not receive notice from any party or other source of the June 16, 2023 shooting and death of Eric Payton Thomas Jr., the Thomas Claim or the Thomas Action (as those terms are defined in James River's Complaint, ECF 1 ¶¶ 1 & 32)." [Doc. 17-2, ¶ 3]. Indeed, Demmink stated that "[a]fter James River received notice of the Thomas Claim on May 15, 2024, James River employees searched records to see if any earlier notice had been provided regarding the incident and found none." [Doc. 5-2, ¶ 9].  Even more, James River gave the Insureds an opportunity—three different times—to provide proof that James River received timely notification. [Doc. 14-1, ¶ 30]. But the Insureds still failed to present any evidence that they provided the required timely notice—now nearly a year after those initial opportunities. Surely if the party responsible for providing notice in the first place had any evidence that they had timely done so, they would have attached it to their response.

[11] The Court acknowledges that the choice-of-law analysis would be different in the Virginia court. But, as noted, since the Court retained jurisdiction, Georgia law applies.

Under Georgia law, "an insurance policy is simply a contract, the provisions of which should be construed as any other type of contract." *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 707 S.E.2d 369, 371 (Ga. 2011); *Hunnicutt v. S. Farm Bureau Life Ins. Co.*, 351 S.E.2d 638, 640 (Ga. 1987). "Construction of the contract, at the outset, is a question of law for the court." *Am. Empire Surplus Lines Ins. Co.*, 707 S.E.2d at 371. Where the terms and conditions of an insurance policy are clear and unambiguous, the Court simply enforces the contract according to its terms, regardless of whether doing so benefits the carrier or the insured. *Id.*; *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90, 92 (Ga. 2008). "But where the policy language is ambiguous, 'such ambiguities must be strictly construed against the insurer as the drafter of the document.'" *Federated Mut. Ins. Co. v. Ownbey Enters.*, 627 S.E.2d 917, 921 (Ga. Ct. App. 2006); *Hurst v. Grange Mut. Cas. Co.*, 470 S.E.2d 659, 663 (Ga. 1996) (citing O.C.G.A. § 13-2-2(5) statutory rule of construction providing that an ambiguous contract will be construed strictly against the insurer/drafter and in favor of the insured).

## I.    <u>The "notice" clause created a condition precedent.</u>

The first question in this case is straightforward: Did the language of the Excess Policy create a condition precedent as to notice? In short, yes.

The Excess Policy states that "[the Insureds] ***must see to it*** that [James River is] notified as soon as practicable of an occurrence that may result in a claim for damages

or suit under this policy."[12] [Doc. 5-3, p. 11 (emphasis added)].[13] That language tracks the policy in *Mt. Hawley* (and numerous other cases), which stated that "[the insured] must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim." 861 F. App'x at 277. And, in *Mt. Hawley*, the Eleventh Circuit concluded "the notice provisions . . . are conditions precedent to coverage." *Id.* Therefore, the Court concludes the notice provision is a condition precedent.[14] *See, e.g.,* *Forshee v. Emps. Mut. Cas. Co.*, 711 S.E.2d 28, 31 (Ga. Ct. App. 2011); *Kay-Lex Co. v. Essex Ins. Co.*, 649 S.E.2d 602, 608 (Ga. Ct. App. 2007); *State Farm Fire & Cas. Co. v. LeBlanc*, 494 F. App'x 17, 21 (11th Cir. 2012) ("As to the Maxam policy and the DSI policy, we are aware that Georgia courts have treated similar mandatory language—'you must see to

---

[12] Even more, the Excess Policy follows "the terms, definitions, conditions and exclusions of the scheduled 'underlying insurance(s)', subject to the policy period, policy limits, premiums and all other terms, definitions, conditions and exclusions of this policy." [Doc. 5-3, p. 8]. That includes a provision stating that "No person or organization has a right under this policy: To sue us on this policy unless all of its terms have been fully complied with." [Doc. 5-6, p. 70]. Therefore, the Excess Policy's terms require compliance before suit. *See also Kay-Lex Co. v. Essex Ins. Co.*, 649 S.E.2d at 606.

[13] The Insureds' arguments regarding the "Knowledge" endorsement are unconvincing. [Doc. 14, pp. 10–11]. Indeed, the endorsement clearly adds a condition, but it does not change the relevant "notice" provision. [Doc. 5-3, p. 21]. Regardless, the Insureds' evidence points to the conclusion that their risk manager *did* know about the June 2023 shooting. [Doc. 14-3, ¶¶ 4–6]. Any evidence that the Insureds' risk manager did not "learn of any demand for a sum exceeding $2 million in connection with the Thomas Lawsuit," does not mean that the risk manager was unaware of the incident *at all*. [*Id.* at ¶ 10]. Additionally, the Insureds received notice—at the latest—on January 10, 2024. [Doc. 5-8, p. 1]. Therefore, even assuming that was the first time the risk manager heard of the incident, she still withheld notice from James River for months.

[14] To be sure, the Eleventh Circuit concluded that similar arguments that this language—i.e., "you must see to it"—did not create a condition precedent were "without merit." *Hathaway Dev. Co. v. Ill. Union Ins. Co.*, 274 F. App'x 787, 791 (11th Cir. 2008).

it'—without more, as conditions precedent.").[15]

## II. The Insureds failed to comply with the notice clause—*i.e.*, the condition precedent.

With that handled, the Court turns to the Insureds' compliance with the notice clause—a condition precedent to coverage. As the Eleventh Circuit held in *Mt. Hawley*, "[w]hen it comes to an insured's adherence to notice provisions, Georgia case law is quite settled. Insurance companies aren't obligated to defend an insured or provide coverage if the insured unreasonably failed to comply with a conditional notice requirement." 861 F. App'x at 275; *see also Bramley v. Nationwide Affinity Ins. Co. of Am.*, 814 S.E.2d 770, 773 (Ga. Ct. App. 2018). That means the Insureds must show that their "failure to comply with a notice requirement was justified," which can "obligate [Plaintiff] to provide a defense or coverage." *Mt. Hawley*, 861 F. App'x at 278.

James River argues that the Insureds knew (or should have known) the shooting was "reasonably likely" to invoke the Excess Policy. [Doc. 5, p. 11 (citing *Owners Ins. Co. v. Hawkins*, No. 1:22-CV-01265-JPB, 2023 WL 5733838, at *9 (N.D. Ga. Sept. 1, 2023))]. Therefore, James River contends that since the Insureds reasonably should have foreseen the shooting to invoke the Excess Policy's coverage, the Insureds' failure to

---

[15] *See also N. River Ins. Co. v. Gibson Tech. Servs., Inc.*, 116 F. Supp. 3d 1370, 1379 (N.D. Ga. 2014) ("Under Georgia law, a notice provision is a condition precedent to coverage when the provision contains the mandatory language 'you must see to it.'"); *Nautilus Ins. Co. v. IMC Constr. Co., Inc.*, No. 1:20-CV-02482-SDG, 2022 WL 902988, at *4 (N.D. Ga. Mar. 28, 2022) ("Here, the notice provisions and the document-forwarding provision are located under a section entitled 'Duties In The Event Of Occurrence, Offense, Claim, or Suit,' and state that the insured 'must' or 'must see to it' that the notices are given. This expresses a clear intention that the provisions are a condition precedent to coverage.").

comply with the notice requirement was not justified.

"In general, the question of whether an insured gave notice of an event or occurrence 'as soon as practicable,' as required by a policy of insurance, is a question for the factfinder." *Plantation Pipeline Co. v. Royal Indem. Co.*, 537 S.E.2d 165, 167 (Ga. Ct. App. 2000). However, "[a]n insured or insurer may be entitled to summary judgment if the delay (or justification for the delay) was reasonable or unreasonable as a matter of law." *SiaSim Columbia, LLC v. Scottsdale Ins. Co.*, No. 21-12918, 2022 WL 2352323, at *3 (11th Cir. June 29, 2022) (applying Georgia law).

As the Georgia Court of Appeals explained:

> "[I]t is the nature and circumstances of 'the accident' or 'the incident' and the immediate conclusions an ordinarily prudent and reasonable person would draw therefrom that determine whether an insured has reasonably justified his decision not to notify the insurer." Relevant circumstances include the nature of the event, the extent to which it would appear to a reasonable person in the circumstances of the insured that injuries or property damage resulted from the event, and the apparent severity of any such injuries or damage.

*Forshee*, 711 S.E.2d at 31 (citation omitted) (quoting *S. Guar. Ins. Co. v. Miller*, 358 S.E.2d 611, 612 (Ga. Ct. App. 1987)). "The burden is on the insured to excuse his failure to perform any such unambiguous term of the contract." *Starstone Nat'l Ins. Co. v. McCanick*, No. 1:20-CV-713, 2021 WL 7541404, at *4 (N.D. Ga. Dec. 20, 2021) (quoting

*Criterion Ins. Co. v. Horton*, 231 S.E.2d 814, 815 (Ga. Ct. App. 1976)).[16]

As noted, the underlying claim involved the shooting death of a person residing at property owned by A.L. Miller and managed by Fairway. The Insureds' claim that "James River does not point to specific evidence that the Insureds knew the Thomas Claim potentially involved liability in excess of $2 million prior [to] the May 10, 2024 demand letter." [Doc. 14, p. 11]. However, as the Eleventh Circuit explained in *Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*,

> Under the notice provision of the excess policy 'the exercise of some judgment on the part of the assured in evaluating the case is contemplated.' This standard requires the insured to base its judgment regarding the amount of the claim against it upon sound reasons. Mere guesswork will not be enough; ignorance is no defense. An insured cannot be heard to say it did not know when it did not inquire. The insured must use due diligence and take appropriate steps to make an informed judgment regarding the nature and amount of the claim.

111 F.3d 852, 861 (11th Cir. 1997); *see also SiaSim Columbia, LLC*, 2022 WL 2352323, at *5. The Court finds that a premises liability claim based on the shooting death of a child in an apartment-complex is likely to involve more than $2 million—the cap of the

---

[16] The Insureds point to *Plantation Pipe Line Co. v. Stonewall Ins. Co.*, 335 Ga. App. 302, 307 (Ga. Ct. App. 2015), to argue that excess carriers are often given notice much later than primary carriers. However, that case is distinguishable for a few reasons. First, that case did not involve a condition-precedent notice clause; therefore, the court conducted a prejudice analysis that is not applicable here. *Id.* at 314. Second, the facts of *Stonewall* involved contaminated soil—not a deadly shooting—meaning that the reasonableness of the relative value of the suit is necessarily different. *Id.* at 303. Finally, since three judges either concurred-in-judgment only, or dissented in relevant part, *Stonewall* serves as non-binding, physical precedent only. *See* Ga. Ct. App. R. 33.2 (stating that prior to August 1, 2020, "An opinion is physical precedent only (citable as persuasive, but not binding, authority); however, with respect to any portion of the published opinion in which any of the panel judges concur in the judgment only, concur specially without a statement of agreement with all that is said in the majority opinion, or dissent.").

Insured's primary insurance.[17]

To combat the conclusion that the event likely involved a claim for more than $2 million, the Insureds rely on "the Insureds' initial assessment that the Thomas Claim was not likely[18] to exceed $2 million[.]" [Doc. 14, p. 13]. That initial assessment also relied on the Bibb County Sheriff's Department's initial inclination that the shooting resulted from gang activity. [*Id.*]. Further, the Insureds rely on the lack of prior demand letters seeking more than $2 million—before the May 10, 2024 letter. [Doc. 14-3, pp. 4–5]. But, "an insured's assessment of its own liability cannot excuse untimely notice." *Owners Ins. Co.*, 2023 WL 5733838, at *9. As one court noted in a similar case, "[t]he Policy expressly requires notice of any occurrence that '*may* result in a claim.' Its plain language thus precludes an insured from withholding notice based on its unilateral assessment of the liability issues arising from an occurrence." *Brit UW Ltd. v. Hallister Prop. Dev., LLC*, 6 F. Supp. 3d 1321, 1329 (N.D. Ga. 2014). "Indeed, the insured's

---

[17] Based on the Court's quick research (and years of experience), premises liability jury verdicts and settlements in Georgia routinely exceed $2 million and have for several years. For example, in 2008, two parties settled an apartment-complex parking lot rape case for $2.5 million. *See* Verdict, *Plaintiff v. Huntington Farms Assocs. LLC*, 2006 WL 6035603 (Ga. Super. Ct. July 1, 2008). Again, in 1993, a Fulton County jury awarded a rape victim $2.5 million for premises liability claims against an apartment complex. *Sewell v. First Gibraltar Bank of Dallas*, 1993 WL 519783 (Ga. Super. Ct. Feb. 1, 1993). In 2014, a Columbus jury awarded a decedent's family $4.5 million for similar premises-liability claims arising from a shooting. *See* Tim Chitwood, *Jury Awards Millions in Lawsuit Over 2014 Fatal Shooting*, Columbus Ledger-Enquirer, August 4, 2017, https://www.ledger-enquirer.com/latest news/article165493847.html. While these are not dispositive on the value of this specific case, they speak to the potential that the shooting incident "may" involve more than $2 million.

[18] But, to be clear, the condition precedent laid out in the Excess Policy is even more broad. It does not require notice of claims that are **likely** to lead to invocation of the Excess Policy; rather, it requires notice of claims that **may** invoke the Excess Policy.

potential liability is the very issue which the company must have reasonable opportunity to investigate with promptness, and which requires a prompt notice of the occurrence." *Id.* (citations omitted).

All things considered, the underlying shooting gave the Insureds sufficient notice that the claim "*may*" involve the Excess Policy.

Now, the Court must decide whether the delayed notice precludes coverage. As a reminder, the shooting occurred on June 16, 2023. [Doc. 14-1, ¶ 16]. A.L. Miller staff entered the incident to the internal incident portal on June 16, 2023. [Doc. 14-3, pp. 3, 7]. The Bibb County Sheriff's Office completed a report on June 28, 2023. [*Id.* at p. 10]. On January 10, 2024, counsel for Thomas's family sent notice to the Insureds, notifying them of the family's intent to file a suit, and seeking information regarding their primary *and excess* insurance carriers. [Doc. 5-2, p. 7]; [Doc. 5-8, p. 1]. On February 15, 2024, the Thomas family filed suit. [Doc. 5-2, p. 2]. The Insureds did not notify Plaintiff of the shooting **_or_** court case until May 15, 2024. [Doc. 5-2, p. 8]. That is nearly 11 months after the shooting occurred, four months after the initial letter notifying the insureds of a possible suit, and three months after the Thomas family filed suit.

"Courts applying Georgia law have held that delays of as little as three to four months preclude recovery as a matter of law." *Allstate Ins. Co. v. Airport Mini Mall*, LLC, 265 F. Supp. 3d 1356, 1378 (N.D. Ga. 2017); *see also Hathaway Dev. Co.*, 274 F. App'x at 791 (applying Georgia law and upholding a district court's determination that a four-

month delay in notice was unreasonable as a matter of law); *Bituminous Cas. Corp. v. J. B. Forrest & Sons, Inc.*, 209 S.E.2d 6, 8 (Ga. Ct. App. 1974) (finding that a delay of four months between the underlying accident and notice was unreasonable); *Horton*, 231 S.E.2d at 815 (concluding that "oral notice almost [four] months after [an] accident[] was neither proper nor timely"). Based on that precedent, the Court easily concludes that the Insureds' delay of nearly 11 months is unreasonable as a matter of law. *See, e.g.*, *Jenkins v. CLJ Healthcare, LLC*, No. 20-13745, 2021 WL 3661074, at *4 (11th Cir. Aug. 18, 2021); *Cureton v. State Farm Fire & Cas. Co.*, 994 F. Supp. 2d 1336, 1339 (M.D. Ga. 2014).

But, even if the Court is wrong regarding the notice of the incident, the Insureds still delayed giving notice of the impending legal claim—and eventual lawsuit—by several months. That, too, violates the Excess Policy's requirement to give prompt notice of any potential claims or suits. [Doc. 5-3, p. 11]; *Nat'l Cas. Co. v. Fulton Cnty., Ga.*, No. 1:16-CV-679-WSD, 2018 WL 1523089, at *17 (N.D. Ga. Mar. 28, 2018) ("Georgia courts have held that a delay of as little as three months between the filing of a lawsuit and notice to the insurer is unreasonable as a matter of law."). No matter how you cut it, the Insureds failed to give James River the requisite timely notice of the incident or the lawsuit.

## CONCLUSION

In the end, the Insureds violated the Excess Policy's condition precedent by taking a risk that the claim wouldn't be worth more than $2 million based on their own

internal analysis. When that didn't pan out, they sought to retrofit coverage by claiming ignorance of the value of the case. But, that just doesn't create any coverage responsibility on the part of James River.

Accordingly, the Court **GRANTS** James River's Motion for Summary Judgment [Doc. 5], **DENIES** the Insureds' Motion to Dismiss [Doc. 13], and **DECLARES** that James River does not have an obligation to defend or indemnify in the underlying case in the State Court of Bibb County, Georgia, or any related action or claim arising out of the June 16, 2023 shooting of Eric Thomas. The Clerk is **DIRECTED** to **ENTER** Judgment in favor of James River and **CLOSE** this case.[19]

**SO ORDERED**, this 19th day of February, 2025.

S/ *Tilman E. Self, III*
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[19] The Court **TERMINATES** Defendant Eric Thomas's Motion for Joinder [Doc. 19]. While the Motion does not clearly seek relief, the Court acknowledges that Defendant Thomas intended to notify the Court of his willingness to join the Virginia action.